**UNITED STATES of America, Plaintiff–Appellee,**

**Music Choice, Applicant–Appellee,**

v.

**BROADCAST MUSIC, INC., Defendant–Appellant.**

**Docket No. 01–6183.**

United States Court of Appeals, Second Circuit.

Argued: June 28, 2002.

Decided: Jan. 14, 2003.

Norman C. Kleinberg, Hughes Hubbard & Reed LLP (Michael E. Salzman, George A. Tsougarakis, David L. Sorgen, Beatrice A. Hamza, on the brief), New York, NY, for Defendant–Appellant.

Bruce D. Sokler, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P .C. (Fernando R. Laguarda, Amy L. Bushyeager, Susan E. McDonald, on the brief), Washington, DC, for Applicant–Appellee.

Before: JACOBS, LEVAL, and KATZMANN, Circuit Judges.

LEVAL, Circuit Judge.

Under a consent decree established in *United States v. Broadcast Music, Inc.,* 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. Dec. 29, 1966), *amended, United States v. Broadcast Music, Inc.,* 1996–1 Trade Cas. ¶ 71, 378 (S.D.N.Y. Nov. 18, 1994) ("BMI Consent Decree"), the United States District Court for the Southern District of New York (Stanton, *J.*), functioned as a rate-setting court, to fix the rate to be paid to Broadcast Music, Inc. ("BMI") by Music Choice as a fair royalty for Music Choice's distribution of BMI music over cable and satellite television, and through Music Choice's own Internet website. The court rejected BMI's proposed blanket license fee of 3.75% of Music Choice's gross revenues derived from its "wholesale" distribution to cable and satellite operators, notwithstanding that a competitor of Music Choice (DMX) had recently negotiated an agreement with BMI for that rate. Instead, the court fixed the rate at 1.75% of Music Choice's wholesale revenues, less than half the rate established in the DMX deal. The court's decision was based on its perception that (1) the price paid for the music by retail customers did not reflect the fair market value of the music to the extent that it covered the cost of materials and services not provided by the authors of the music but necessary to effectuate the delivery of the music; and (2) the fair market value of the music was better expressed by the wholesale price at which Music Choice sold to the cable and satellite operators. The court further found that Music Choice's distribution of its product over cable and satellite television was analogous to its Internet distribution, about which the parties were in agreement that a 1.75% rate was appropriate.

We vacate and remand.

## BACKGROUND

BMI, founded in 1939, is a not-for-profit organization, which functions as the representative of the owners of copyrighted music to license performances of the recordings. BMI issues non-exclusive licenses to music users and distributes its revenues as royalties to its affiliated composers and music publishers, who are the owners of the copyrights. BMI typically issues blanket licenses, that is, licenses to broadcast, for a finite period of time, any and all of the approximately 4.5 million musical works in its portfolio. Because of unique conditions recognized as potentially anticompetitive, BMI's business operations, like those of its chief competitor, the American Society of Composers, Authors and Publishers (ASCAP), are regulated by a court-approved consent decree. *See BMI Consent Decree.* In 1994, the court modified the Consent Decree to include, as in the case of ASCAP, a rate court mechanism for determination of appropriate license fees when BMI and its potential customer could not agree.

Music Choice, a partnership, whose partners (or their corporate parents) include AOL Time Warner, AT & T, Cox Communications, Comcast, Adelphia, Sony, Microsoft and EMI Group, transmits 55 different music channels to listeners' television via cable and satellite, and to their computers via the Internet. It was the first entrant into the so-called residential music service industry, consisting of companies providing music to cable and satellite TV subscribers. Music Choice's channels are organized around genres of music (e.g. country or classical) and provide commercial-free, CD-quality broadcasts around the clock. Information about the musical composition being played is displayed in text form on the listener's television (or computer) screen.

The mechanics of the transmission are as follows. For purposes of its cable and satellite customers, Music Choice beams its channels to its own satellite, whence they are transmitted to the cable systems of various cable operators or to the proprietary satellites of satellite TV operators. Either way, the channels are ultimately broadcast to the listening public in the same form as they are originally transmitted by Music Choice. With respect to its Internet audience, Music Choice makes available approximately 40 channels through its own website. As of March 2001, Music Choice had approximately 6 million cable / wireless customers, 15 million satellite customers, and 1,500 Internet subscribers.

Music Choice's current business plan represents a departure from the early distribution of its product. Originally, Music Choice's channels were available only through cable providers, which offered them to customers as a premium, "a la carte" service. Under that arrangement, the cable companies charged their retail customers approximately $10 per month for the Music Choice service, of which approximately $4—and later about $2.50—were remitted to Music Choice. The then-prevailing technology also required that cable companies attach a separate "tuner" to their customers' cable boxes in order to provide them with the Music Choice service.

As far back as 1993—two years after Music Choice commenced the operation of its service—it became obvious that the distribution of its channels as a "premium" product would not be lucrative. Thus, when Music Choice began making its product available via satellite TV through a company called DirectTV, it agreed to provide its channels as part of DirectTV's basic and enhanced packages—rather than as an "a la carte" premium product. Similarly, Music Choice essentially agreed to have cable companies broadcast its channels as part of a basic cable package. The new distribution regime was made possible by a change in technology, such that the "tuner" was no longer required for listeners to access the music through their cable plans. At the time of the trial, the vast majority of Music Choice customers received the service as part of a bundle of cable or satellite TV programming for which the customers paid a blanket fee, rather than through a separately priced "a la carte" arrangement.

In 1989, before commencing operations, Music Choice entered into negotiations with BMI for a blanket, through-to-the-viewer license. A "through-to-the-viewer" (or listener) license permits the licensee (i.e., Music Choice) to distribute the copyrighted materials to the cable and satellite companies (which distribution is considered one "performance" for purposes of copyright law) and further permits the cable and satellite companies to distribute the music to the public (deemed a separate "performance"). Under a split license re-

gime, in contrast, Music Choice would take a license for the initial transmission to the cable or satellite operator, and the latter would be required to secure a separate license for its broadcast to the viewer.[1] In 1990, BMI and Music Choice signed a three-year through-to-the-viewer agreement, requiring Music Choice to pay a royalty for the first two years of 2% of the revenues it received for its sale to the cable / satellite operators, plus 2% of the cable / satellite operators' retail sales of the music, net of the price they paid to Music Choice. (For the third year, the rate increased to 2.1 % for both segments.) This royalty could more easily and clearly have been expressed as simply 2% (later 2.1%) of the retail sales of the cable / satellite operators. The royalty rate was expressed in the more complicated two part manner in deference to BMI's insistence that what was being licensed was not one but two compensable performances in series, each requiring a separate payment. The contract contained a so-called "most favored nation" provision, according to which, if BMI reached a license agreement with a comparable company on more favorable terms than those established by BMI's agreement with Music Choice, BMI would offer those more favorable terms to Music Choice as well.

For a while, this licensing agreement functioned smoothly. Over time, however, it became increasingly difficult to identify the portion of cable company revenues attributable to customer purchase of Music Choice programming, because its music was offered to customers under a blanket fee covering an undifferentiated mix of visual and audio programming, rather than as separately paid programming. BMI, in the meantime, had struck a deal with Music Choice's competitor, DMX, in which BMI ceased to require that DMX's fee be expressed as an aggregate of two fees for two successive performances. The fee was expressed as a percentage of the "wholesale" price—i.e., the price paid by the cable / satellite operators to DMX for the music programming. The royalty rate applied to that wholesale price was set at slightly less than double the rate applied in BMI's prior contracts to the retail price. Thus, BMI charged a flat rate of 3.75% of DMX's gross revenue from October 1, 1994 through September 30, 1996, rising to 4% from October 1, 1996 until September 1999. The testimony showed that the objective in fixing the royalty rate applied to the wholesale revenues of the music provider at approximately double the rate previously applied to retail revenues of the cable / satellite operators was to maintain the royalties at roughly the same level. In other words, it was assumed that the cable / satellite operators charged their retail customers approximately double what they were paying to the providers of the music programming, so that 4% of wholesale would come to about the same figure as 2% of retail.

The parties contest whether the BMI–DMX deal provides an appropriate benchmark for Music Choice's rate, or whether idiosyncratic circumstances distorted that negotiation so that the resulting agreement does not accurately reflect the relative bargaining strengths of Music Choice and BMI.

The first agreement between BMI and DMX in 1991 had been essentially identical to the 1990 agreement between BMI and Music Choice: the license fee followed the same two-tier structure, and required DMX to pay the identical rates (2% of its

---

1. In *National Cable Television Association v. Broadcast Music, Inc.,* 772 F.Supp. 614, 650 (D.D.C.1991), the court decided that BMI's practice of issuing split licenses was incompatible with the BMI Consent Decree.

own wholesale revenues, plus 2% of the retail revenues of the cable companies, net of their payment to DMX, growing to 2.1% during the third year of the three-year contract). Sometime before the expiration of the contract, DMX and BMI became embroiled in a dispute over whether DMX was obligated to count towards the revenues of the retailers (2.1% of which it was obligated to pay to BMI) the cost of tuners sold to retail customers. BMI took the view that it was and concluded that through December 1993, DMX owed it $445,231. The district court found furthermore that DMX's strained financial situation made it especially eager to arrive at a deal with BMI, even if disadvantageous, so long as DMX was guaranteed (by a most favored nation provision) to be no worse off than its competition. Under these circumstances, DMX agreed to approximately the same rate it had previously paid under the two-tier structure (expressed as a percentage of DMX's wholesale revenues), and the parties agreed to settle the hardware dispute for $222,625.22, one half the amount BMI claims was owed it by DMX. As the wholesale revenues were assumed to be half the retail revenues, the old rate was essentially maintained by applying approximately double the rate to its wholesale revenues as had previously been applied to the retail revenues of the cable / satellite operators for DMX's programming.

*Proceedings Below*

From October 1994 through January 1997, Music Choice rolled over on a monthly basis an interim license agreement with BMI, based on the terms of the DMX agreement. By letter of January 31, 1997, Music Choice applied to BMI for a blanket license for cable, satellite, and Internet distribution applicable to the ten-year period from October 1, 1994 to September 30, 2004. The parties were unable to agree on terms. Pursuant to the BMI consent decree, BMI then applied to the district court sitting as a rate court for determination of a reasonable license fee for the relevant period.

In a November 15, 1999 order, the court, taking the DMX agreement as a guide, set an interim fee, subject to retroactive adjustment, of 3.0% of Music Choice's gross revenues for its cable and satellite services, and 1.75% for its internet service, cautioning at the same time that its determination of appropriate final rates could depart significantly from the interim rates.

Pursuant to the Consent Decree, the court conducted a six-day trial in May 2001 to determine the appropriate rate. BMI argued that the rate court ought to take the BMI–DMX agreement as a guide, and apply a 3.75% rate. Music Choice argued for a lower rate. The district court issued its opinion and order on July 20, 2001. After first observing that arms-length transactions have typically been used by the rate court under the comparable AS-CAP consent decree to provide benchmarks for rate-setting, the court observed that the DMX–BMI agreement was the product of idiosyncratic background conditions, noting especially DMX's urgent need to reach agreement in order to generate cash flows. The district court thus rejected the DMX transaction as an appropriate benchmark for the Music Choice license fee.

The court ruled that a rate of 3.75% of Music Choice's wholesale revenues was not appropriate, reasoning as follows: It recognized that in the DMX contract, the 3.75–4.00% rate applied to DMX's wholesale revenues was arrived at in attempt to approximate predecessor contracts's aggregate of 2% of DMX's wholesale revenues, plus 2% of the cable / satellite operators' retail sales (to the extent they exceeded the wholesale). The court then

expressed the view that retail revenues of the cable / satellite operators did not properly reflect the fair market value of the music because in paying the retail price the subscriber was paying for materials and services not provided by the author of the music, such as the machinery of transmission and delivery to the subscriber's home. It reasoned that the author of the music should not be compensated by reason of such materials and services. The court concluded that "the true value of the music is expressed at the earlier stage where it is incorporated into Music Choice's programs" and sold wholesale to the cable / satellite operators.

Recognizing that the fee of nearly 4% of wholesale was designed to approximate the same figure as the sum of 2% of wholesale, plus 2% of retail minus wholesale, the court disallowed the component· of the DMX fee that derived from the retail revenues of the cable / satellite operators (2% of retail revenues minus the wholesale price). The court stated, "[T]he idea that to recover the full value of the music the blanket license rate should include a component based on the cable or satellite operators' revenues, is misconceived." Only the portion of the fee based on the music provider's wholesale revenues was deemed appropriate. Because the retail revenues were estimated to be approximately double the wholesale revenues, the inappropriate 2% of the retail revenues (net of wholesale) was estimated to equal approximately 2% of the wholesale revenues. The district court therefore deducted that 2% from the DMX model and set Music Choice's fee at the remaining 1.75% of its wholesale revenue.

## DISCUSSION

This is the first time our Court has been invited to review a rate-setting pursuant to the BMI Consent Decree. We see no reason why our approach to this case should differ from any of the numerous occasions on which we have reviewed rate court decisions pursuant to the ASCAP consent decree. *See, e.g., ASCAP v. Showtime / The Movie Channel, Inc.,* 912 F.2d 563 (2d Cir.1990). The consent decree itself stipulates that "[i]n any [rate] proceeding, [BMI] shall have the burden of proof to establish the reasonableness of the fee requested by it. Should [BMI] not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the evidence." *BMI Consent Decree,* art. XIV(A).

In making a determination of reasonableness (or of a reasonable fee), the court attempts to make a determination of the fair market value—"the price that a willing buyer and a willing seller would agree to in an arm's length transaction." *Showtime,* 912 F.2d at 569. This determination is often facilitated by the use of a benchmark—that is, reasoning by analogy to an agreement reached after arms' length negotiation between similarly situated parties. Indeed, the benchmark methodology is suggested by the BMI consent decree itself, of which article VIII(A) enjoins disparate treatment of similarly situated licensees.

We have observed that "[f]air market value is a factual matter, albeit a hypothetical one." *Showtime,* 912 F.2d at 569, but at the same time that the "factual component" of rate setting "does not render all aspects" of the district court's decision "subject to review under the 'clearly erroneous' standard." *Id.* This is because in "making a factual determination, a decision-maker might rely on legally impermissible factors, fail to give consideration to legally relevant factors, apply incorrect le-

gal standards, or misapply correct legal standards." *Id.*

*The district court's analysis of the fair market value of the music*

The district court correctly perceived that the appropriate royalty rate is determined by applying the appropriate percentage rate to the fair market value of the music. We believe, however, that in seeking to determine the fair market value of the music, the court made a fundamental error. The court took the view that retail price was not a good indicator of fair market value because the retail seller incurred, and needed to cover, the costs of processes and services necessary to bring the music to market which were not provided by the copyright owners. The court then took the position that the fair market value of the recorded music was the wholesale price at which Music Choice sold the music to the cable / satellite operators. This reasoning led the court to set BMI's rate at approximately half of the rate that had prevailed under its previous contract with Music Choice, as well as less than one half of the rate recently negotiated between BMI and DMX.

In our view, this reasoning was flawed. As to the court's rejection of retail revenues, absent some valid reason for using a different measure, what retail customers pay to receive the product or service in question (in this case, the recorded music) seems to us to be an excellent indicator of its fair market value. While in some instances there may be reason to approximate fair market value on the basis of something other than the prices paid by consumers, in the absence of factors suggesting a different measure the price will-

ing buyers and sellers agree upon in arm's-length transactions appears to be the best measure.[2] See, *Showtime*, 912 F.2d at 569.

It is true without doubt that to make the music available to its customers, the retail seller must incur expenses for various processes and services not provided by the owner of the music, such as the laying of cable, the establishment of satellite systems, etc. However, this is in no way incompatible with the proposition that retail revenues derived from the sale of the music fairly measure the value of the music. The customer pays the retail price because the customer wants the music, not because the customer wants to finance the laying of cable or the launching of satellites.

By analogy, when a customer purchases a recording of music on a compact disc, in order to make a profit the retailer must charge a purchase price sufficiently large to cover the various expenses incurred for materials and services necessary to the ultimate delivery of the recorded disc. Nevertheless, if the retail customers paid $12 to buy the record, that is because it was worth $12 to them to acquire a recording of that music. The customers were not motivated to acquire the plastic disc, except as a delivery device for the desired music; they were not motivated to spend their money to pay the salaries of truck drivers, warehousemen, bookkeepers, office administrators, salespersons and executives, all of whom played necessary roles in bringing the record to market. What the customers wanted was a record of certain music, and they were willing to pay $12 to get it. In such circumstances, it

---

**2.** We recognize that where the customers pay a single fee for a package of audio and visual programming, which includes the music, it will be difficult to determine what part of the fees paid was for the music, as opposed to other programming. That, however, was not the basis on which the district court rejected the retail revenue as an indication of fair value.

appears that the retail price (multiplied by the number of records sold at that price) is an excellent indicator of the fair market value of the music in recorded form, notwithstanding that portions of those revenues were needed to cover expenses for many services that were not provided by the author of the music. The fact that the music in our case was transmitted via cable or satellite to the reception facilities of subscribers, rather than by recording it on plastic discs and transporting them by truck or rail to retail stores, does not affect the validity of the point.[3]

The district court appears to have confused two concepts. It is undoubtedly correct that the authorship of the music was but one of the many elements that needed to be financed by the retail revenues. Bringing the recorded music to retail customers, whether by cable, satellite, or compact disc, necessarily involves numerous expenses above and beyond purchasing the music rights from the owner. The fact that selling the music at retail involves expenses not attributable to the music itself explains why the appropriate royalty for the copyright owner will be only a small percentage of the fair market value of the music. It does not, however, support the very different conclusion drawn by the district court: that the revenues from the retail sales of the music necessarily exceed the fair market value of the music.

The district court adopt adopted the proposition that the wholesale price of the music (the price at which Music Choice sold the music to the cable/satellite operators) represented the fair market value of the music. The court gave no explanation why this should be the case other than the reasoning described above to the effect that the retail price must exceed the fair market value because it covered elements not furnished by the owner of the music, which we find unpersuasive. Furthermore, the price a retailer pays to purchase goods from a wholesaler will vary based on factors that arise from the business structure of the industry or entity—factors that have no bearing on the fair market value of what is being sold.[4]

A further flaw in the district court's reasoning is shown by the fact that the wholesale price, like the retail price, also covered costs for services and materials other than the music. Music Choice, for example, maintains a satellite system, to

---

**3.** If it were demonstrated that retail purchasers were motivated to pay more because of advantages that resulted from a particular mode of delivery, such as better quality, better accessability or whatever, this might justify a conclusion that retail price of the service purchased by the customer exceeded the fair market value of the music. That, however, was not the basis of the district court's denial that retail revenues are relevant in calculating fair market value.

**4.** Assume for example two competing national retailers, A and B, which sell the same item to the public for the same price. Upon leaving the factory after fabrication, the item passes through several necessary steps of transportation, warehousing, distribution, and packaging before entering the retailing locations. Retailer A performs only the ultimate retailing function, i.e., it purchases the goods, already packaged for sale, from a jobber-wholesaler for delivery directly to A's retail outlets. Retailer B, in contrast, has integrated into its own operation the various postfabrication functions of transportation, warehousing, and packaging, so that it essentially purchases the goods as they exit the factory door. Retailer B will pay a lower wholesale price than retailer A. The items sold by A and B, on the other hand, are indistinguishable and presumably have the same fair market value. The difference in the wholesale prices paid by A and B do not measure differences in the fair market value of the goods they sell; they arise because of differences in the ways that A and B have organized their operations, differences that are immaterial to the fair market value of what is being sold.

beam the music to both cable and satellite operators. In addition, we can safely assume it maintains offices and employs salespeople, business executives, attorneys, and secretarial and clerical staffs. All of these represent expenses which it must cover out of its sales revenues in order to operate profitably. If the district court were correct in its reasoning that the retail revenues deriving from the sales of the music necessarily exceeded the music's fair market value because the retail revenue covered the costs of various materials and services not attributable to the music, then it would follow equally, for the same reasons, that the wholesale revenues derived by Music Choice from the sale of the music also exceeded the fair market value of the music.

In short, we believe the district court did not have adequate reason to support its conclusion that the fair market value of the music was overvalued by the retail revenues and was appropriately measured by Music Choice's wholesale revenues.[5] In saying so, we recognize that this does not provide the solution to the problem before the district court, which was to set a proper rate. In our view, however, the district court's rejection of aggregate retail revenue as the best indicator of fair market value was premised on flawed assumptions and must be set aside.[6]

We vacate the judgment and remand to the district court for further consideration. In so doing we express no view what would be a proper rate.

## CONCLUSION

We vacate the judgment of the district court and remand for further proceedings.

KATZMANN, Circuit Judge, concurring:

I concur in the majority opinion's view that the district court erred in rejecting the portion of the fee derived from the cable and satellite operators' revenues.

5. We do not mean to suggest that it would be inappropriate for the district court to estimate fair market value by first fixing on wholesale revenue and then making appropriate adjustments to that figure to approximate fair market value. Especially in a case such as this, where retail revenues attributable to the music are difficult to ascertain because of the bundled packages offered at retail, while wholesale revenues attributable to the music are easily determined, that may be a useful way to proceed. That, however, is very different from proposing that wholesale revenue, in itself, represents the fair market value of what is being sold.

6. The district court believed its setting of BMI's royalty rate at 1.75% of Music Choice's wholesale revenues was supported by the fact that BMI itself had agreed with Music Choice to charge 1.75% of Music Choice's revenues from distribution of the music via the Internet. If comparison to Music Choice's Internet marketing proves anything (which we doubt), it rather tends to undermine the district court's conclusion.

In arguing that BMI's agreement to receive 1.75% of Music Choice's revenues from Internet distribution was reason to set the cable / satellite rate at 1.75% of wholesale revenues, the district court overlooked that Music Choice's Internet revenues are *retail* revenues. On the Internet, Music Choice sells directly to retail customers. Using Internet rates as a guide would therefore imply setting a cable / satellite rate of 1.75% of *retail* revenues, or approximately double the rate the district court set.

We do not mean to suggest, however, that the Internet rate supplies a fair benchmark. Internet distribution is in its infancy. Such distribution goes to only 1,500 customers, while the cable / satellite services distribute Music Choice's music to 21 million. To use the Internet rate as a benchmark for setting the cable / satellite rate would be an extreme case of the tail wagging the dog. We make these observations not to advance the proposition that BMI's agreed Internet rate supports a doubling of the rate set by the district court, but only to rebut the suggestion that it supports the district court's conclusion.

For the present time, I would leave open whether "fair market value" is best measured by wholesale revenues, retail revenues, or some other measure. I would remand to the district court to consider what constitutes "fair market value" in light of all of the relevant information.